



## MEMORANDUM OPINION

No. 04-11-00726-CR

Terrell James **BLUE**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 437th Judicial District Court, Bexar County, Texas
Trial Court No. 2008CR11768
Honorable Lori I. Valenzuela, Judge Presiding

Opinion by:   Phylis J. Speedlin, Justice

Sitting:   Phylis J. Speedlin, Justice
Rebecca Simmons, Justice
Steven C. Hilbig, Justice

Delivered and Filed:  September 19, 2012

AFFIRMED

Terrell James Blue appeals his conviction for murder, arguing the trial court erred in

denying his motion for directed verdict and in excluding a statement he claims qualified as an

excited utterance.  We affirm the judgment of the trial court.

### BACKGROUND

The following testimony was presented during the guilt/innocence portion of trial.

Deputy William Bryant testified that on September 11, 2008, he responded to a call for a

reported stabbing in the Glen, a neighborhood in northeast San Antonio known for violence and drug use. Bryant was the first officer to arrive, and observed mass confusion. The stabbing victim, later identified as Stephen Martin, was lying on the front porch, bleeding. Martin told Bryant, "That [expletive] Blue just stabbed me." Bryant called for medical assistance and then attempted to gather witness statements, but found that people were not willing to talk to the police for fear of being labeled a "snitch." One bystander, however, signaled with his eyes for the deputy to look across the street, where Bryant found a bloody steak knife. Another bystander told Bryant that Blue's stepfather, Leroy Lewis, was leaving the street in his car. Bryant stopped Lewis's car, and Lewis told him that Blue was at Lewis's house. Bryant went to Lewis's house where Blue surrendered without resistance.

Emergency medical personnel arrived at the scene of the stabbing at 5:24 p.m. and transported Martin to the hospital. His main injury was a stab wound to the left flank region. Martin died less than two hours after arriving at the hospital.

Leroy Lewis, who is married to Blue's mother, Dora, testified that his home was a 5-minute drive and 15 to 20-minute walk from the Glen. After reviewing two statements he gave to the police shortly after the incident, Lewis testified that on September 11, 2008, Blue asked Lewis to take him to the Glen to pick up his girlfriend, Chante "Rene" Hood. Because Blue is legally blind, he is not supposed to drive alone, although he had done so in the past. When they arrived at the street where the stabbing incident occurred, Blue got out of the car and eventually jumped a fence in front of a house. Lewis then saw a man chasing Blue with what appeared to be a pipe. Lewis got out of his car and stood within 10-15 feet of the two men. The other man, Martin, had the pipe cocked back, and was cursing at Blue and telling him not to come onto his property. Lewis told Martin that he was Blue's father and pleaded with him not to hit Blue.

Martin told Lewis to get Blue out of there, and Lewis told Blue, "Let's go." Lewis turned around to leave. A crowd gathered, and someone said that Blue had a knife. When Lewis turned back around, he saw Blue strike Martin with his left hand. Lewis also saw the two men fighting in the street. He stated that Blue looked like a scared cat and Lewis thought that Martin was going to hit or even kill Blue. Lewis left the area in his car, but then regretted leaving Blue behind, so he returned in a roundabout way and saw police cars and police tape. An officer stopped and asked Lewis where Blue was; Lewis said he did not know, but agreed to allow officers to search his home in his presence.

Rene Hood testified that on the day in question, she bought some crack cocaine from Larry "Pimp" Broughton and went to Martin's house to get high. Shortly after arriving at Martin's house, she heard a noise at the front door, and Martin went to investigate. Rene heard Martin and Blue arguing about Blue having jumped the fence to Martin's house. Rene then saw Martin come into the dining room and grab an ax handle. Rene went outside and attempted to calm Blue. She got Blue to cross the street, and Martin followed. Rene saw that Blue had a knife in his back pocket. Rene left, and walked to her daughter's nearby house.

Larry Broughton, Jr. went by the nickname "Pimp" and lived in the Glen in 2008. He testified that on September 11, 2008, Blue came to his house looking for Rene. Broughton told Blue he had not seen her. Broughton saw Blue walk down the street "ranting and raving and looking for" Rene, and jump over the fence to Martin's house, three houses down from Broughton's. Broughton described Blue as violent and mad, "like rrrr." Broughton saw Blue bang on Martin's door, and then saw the two arguing on either side of the outer iron bar door. Broughton saw that Blue had a knife, which he flashed in front of Martin. Martin then came out of his house holding a stick or a pipe wrapped in black tape, and tried to hit Blue as he jumped

over the fence, but he missed. The two men then argued on either side of the fence, with Martin telling Blue to get out of his yard. Blue tossed a cup of beer at Martin, but it did not hit him. Blue then walked off.

About two minutes later, Rene came out the door. When Blue saw her leave Martin's house, he became enraged, and ran toward Martin's gate. The men starting arguing again, and Martin unlocked the chain on the gate to let Rene out. Blue was trying to get in the gate, and Rene was attempting to calm him down. Rene managed to get Blue out of Martin's yard and around the corner, but "all of a sudden," Blue came back around the corner "in a rage." Rene ran in front of Blue and got between him and Martin. Blue reached over Rene and punched Martin in the jaw, practically knocking him out. Martin went down on one knee and supported himself with the stick. At that point, Rene left and walked toward her daughter's house. At that time, Blue "stepped up on [Martin]," hitting him a second time in the face and knocking him out. Blue then reached in his back pocket, said "I told you," and stabbed Martin. Broughton, who stated that he was "cool with both men," had attempted to stop the fighting before Blue stabbed Martin. After the stabbing, Broughton said, "you done it now," and turned his back on Blue with his hands up. Broughton thought that Blue was going to stab Martin a second time, but he was not sure whether Blue stabbed Martin again. Broughton stated that Blue did not looked scared at the time he stabbed Martin, and that Martin was not threatening Blue at the time.

Martin then mustered the strength to jump up off the ground and started chasing Blue with the stick in his hand. Blue was running backwards in the street with the knife in his hand, smiling and smirking. They went down about three or four houses, then Martin turned back toward his house, saying "help me, help me." Martin got into his yard and collapsed on his front porch. Blue came into Broughton's yard and asked him to give him ten dollars. Broughton said,

"I'm not going to give you nothing." They heard the police coming, and Blue, who still had the knife in his hand, threw it in Broughton's yard and it bounced into the street. Blue ran through Broughton's house and backyard. Then the police arrived. Broughton stated he did not give the police a statement that day because he is a "street dude" and there are "street codes" and he was not trying to get involved because "snitches get ditches." Broughton did finally provide a statement a few months later when Detective "Scarface"[1] visited his house after he had moved away from the Glen. Broughton told the detective what happened, and the detective wrote it down because Broughton cannot read and write "that good," "so [the detective] wrote the letter and I just signed it." An audio recording of Broughton's statement was admitted and played for the jury. Broughton admitted having "a [criminal] record a mile long," including felony drug and assault offenses.

George Saidler, a retired police officer, testified that he was working as an investigator with the Bexar County District Attorney's office in 2008. He was known on the east side as "Detective Scarface." Because Broughton would not cooperate with the Bexar County Sheriff's Office, Saidler went to see if he could get a statement from Broughton concerning the Martin stabbing. Saidler did not threaten or coerce Broughton in any manner or make him any promises in exchange for his statement. Saidler wrote out Broughton's statement as he talked, and then recorded the reading back of the statement to Broughton. Broughton also identified Blue in a photo line up.

Dr. Elizabeth Peacock, Assistant Bexar County Medical Examiner, testified that she performed the autopsy on Martin's body. The cause of death was one stab wound through the back. The stab wound, which was at least two inches deep and required a lot of pressure to

---

[1] Detective Scarface is a street name for George Saidler, a former San Antonio Police detective working as an investigator with the Bexar County District Attorney's office.

inflict, pierced Martin's lung. Peacock further stated that Martin had ingested cocaine, a drug that could cause him to exhibit "crazy" behavior.

Three witnesses testified for the defense. The first was Dora Lewis, Blue's mother. Dora stated that the family was preparing to barbecue and watch a movie when her husband, Leroy Lewis, and her son, Blue, left to pick up Blue's girlfriend, Rene, in the Glen. Her son, however, did not return with her husband. Her son rang the doorbell and was frantic and in tears, shaken and excited and scared. At that point, the State objected to any further testimony, and a hearing was held outside the jury's presence, as will be discussed below.

Dr. Kent Anderson, an ophthalmologist who treated Blue, testified that Blue is legally blind. The vision in Blue's right eye was 20/400, and Blue had only "hand motion vision" in his left eye. If someone were standing in front of Blue, he might see shadows and movements off to the side. Although he could see the shape of someone in front of him, he might not recognize from sight alone who the person was. If an ax handle were wielded in front of him, all Blue would see was a blurred blunt object.

Antia Moore lived in the Glen in 2008. Moore testified that she did not see the stabbing incident, but when she returned to the street where the stabbing occurred, she saw police cars with flashing lights. There were a lot of people around, and Moore spoke with Broughton, Broughton's daughter, Rene, and someone named Patrice. They were all excited and talking about the stabbing. They said that Blue stabbed Martin because Martin came at Blue with an object. They said that they think "it's going to be self-defense."

The jury rejected Blue's theory of self-defense and found him guilty of murder. Blue pled true to both enhancement paragraphs alleged in the indictment. During punishment, the jury found that Blue acted under the immediate influence of sudden passion arising from an adequate

cause, and assessed a punishment of 26 years' confinement. *See* TEX. PENAL CODE ANN. § 19.02(a)(1)-(2), (d) (West 2011). The trial court sentenced Blue accordingly. Blue timely appealed.

*Motion for Directed Verdict*

Blue first argues that the trial court erred in denying his motion for directed verdict, because the evidence was legally insufficient to support the jury's implicit rejection of his claim that he acted in self-defense.

A person is guilty of murder if he or she intentionally or knowingly causes the death of an individual. TEX. PENAL CODE ANN. § 19.02(b) (West 2011). A person is justified in using force against another person when and to the degree he reasonably believes the force is immediately necessary to protect himself against the other person's use of or attempted use of unlawful force. *See id.* § 9.31(a) (West 2011). A person is justified in using deadly force against another in self-defense if the person would be justified in using force under Penal Code section 9.31 and the person reasonably believes that deadly force is immediately necessary to protect the person against the other's use or attempted use of unlawful deadly force. *Id.* § 9.32(a)(1)-(2)(A) (West 2011).

When reviewing legal sufficiency of the evidence to support a verdict, we view all of the evidence in the light most favorable to the verdict, asking whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Brooks v. State*, 323 S.W.3d 893, 899, 912 (Tex. Crim. App. 2010); *Wesbrook v. State*, 29 S.W.3d 103, 111 (Tex. Crim. App. 2000), *cert. denied,* 532 U.S. 944 (2001). When a defendant challenges the legal sufficiency of evidence to support rejection of a defense such as self-defense, we examine all of the evidence in the light most favorable to the

verdict to determine whether any rational trier of fact could have found the essential elements of the offense and also could have found against the defendant on the self-defense issue beyond a reasonable doubt. *Saxton v. State*, 804 S.W.2d 910, 914 (Tex. Crim. App. 1991).

The defendant has the burden of producing some evidence to support the claim of self-defense. *Zuliani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003) (citing *Saxton*, 804 S.W.2d at 913-14). Once the defendant produces such evidence, the State has the burden of disproving the defense. *Zuliani*, 97 S.W.3d at 594. The burden of persuasion does not require the State to produce evidence; rather, it requires only that the State prove its case beyond a reasonable doubt. *Id.* When the jury finds the defendant guilty, it implicitly finds against the defensive theory. *Id.*

Self-defense is an issue of fact for the jury to determine. *Saxton*, 804 S.W.2d at 913. In a sufficiency review, we do not re-evaluate the weight and credibility of the evidence, and we defer to the jury's determinations of credibility. *See Lancon v. State*, 253 S.W.3d 699, 705 (Tex. Crim. App. 2008); *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). We presume that the jury resolved all inconsistencies in the evidence in favor of the verdict. *See Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).

It is undisputed that Blue inflicted one stab wound which penetrated Martin's lung and caused his death. Blue's theory was that he acted in self-defense. Blue contends the evidence demonstrated that he held a reasonable belief that deadly force was immediately necessary to protect himself from Martin's use of force because he was legally blind and perceived Martin's wielding of the ax handle as a big blur. He also argues that the State's key witness, Larry "Pimp" Broughton, should be doubted because "no reasonable juror could have given Pimp any credibility." We respectfully disagree. The jury was informed that Broughton had "a record a

mile long" and was free to reject his testimony. *See Saxton*, 804 S.W.2d at 914. As to the issue of Blue's eyesight, the jury was also free to reject the notion that his poor vision caused him to be particularly afraid of the ax handle wielded by Martin. The jury was solely responsible for determining the credibility of the witnesses and was free to accept or reject the defensive evidence. *See Saxton*, 804 S.W.2d at 914.

Moreover, there was evidence presented that Blue went to Martin's house with a knife, jumped his fence, and banged on the door. After leaving Martin's house, Blue returned again when he saw Rene outside. After Rene managed to get him away from the house, Blue came back, and hit Martin twice, knocking him to the ground. It was only after Martin was on the ground and no longer a threat that Blue stabbed him. In light of the facts, the evidence does not support Blue's assertion of self-defense. Based on the evidence presented, a rational juror could have found the essential elements of murder and also implicitly rejected Blue's claim of self-defense. *See Zuliani*, 97 S.W.3d at 594-95; *Saxton*, 804 S.W.2d at 913-14. Thus, we disagree that the trial court erred in failing to grant Blue's motion for directed verdict. We overrule Blue's first issue on appeal.

### *Excited Utterance?*

In his second and third issues, Blue contends the trial court erred when it excluded his statement to his mother that he stabbed a guy who came after him with a stick, because this was an excited utterance not excluded by the hearsay rule, and the exclusion (1) denied him the constitutional right to present a complete defense and (2) affected his substantial rights.

The following testimony was proffered by Blue outside the jury's presence:

Q:      Ms. Lewis, you stated that when your son came in he was - - I believe you said looked scared and had tears out of his eyes; he was shaken, excited, what have you. And you were getting ready to say that he said something to you. And if you can remember, try to remember everything that he said to you.

A:    When I opened the door and I let him in and I asked him what is wrong. And he says, Mom, he says, This guy came after me with - - I don't know what is was, an ax handle or a - - or a - - or a stick. And he says, and he was trying to hit me. And my son can't see that well anyway.

Q:    Well, no, Ms. - - Ms. Lewis, I'm not asking you what you think,  I'm asking you exactly what your son, as you can remember, exactly what your son said to you, okay.

A:    He said that, Mom, this guy came after me with a - - - some kind of stick or ax handle or something, but I don't know what it was and I stabbed him in self-defense.

The State objected on the basis of hearsay.  Blue's counsel offered to instruct Dora Lewis to omit the legal term "self-defense."  The trial court sustained the State's hearsay objection, ruling that "I don't think that the entire defensive theory should come in through the defendant's statement in an excited utterance to somebody who is not an eyewitness . . . ."

We review for an abuse of discretion a trial court's determination of whether evidence is admissible under the excited utterance exception to the hearsay rule.  *Wall v. State*, 184 S.W.3d 730, 743 (Tex. Crim. App. 2006).  A trial court does not abuse its discretion, and we will not reverse a trial court's ruling, unless the ruling is so clearly wrong as to lie outside the zone of reasonable disagreement.  *Zuliani*, 97 S.W.3d at 595.

Hearsay is a statement, other than one made by the declarant while testifying at a trial or hearing, offered in evidence to prove the truth of the matter asserted.  TEX. R. EVID. 801(d). Hearsay is not admissible unless it fits into an exception provided by a statute or rule.  *See* TEX. R. EVID. 802.  An excited utterance, one of the hearsay exceptions, is a statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition.  *See* TEX. R. EVID. 803(2); *Zuliani*, 97 S.W.3d at 595.  This exception is based on the assumption that, at the time of the statement, the declarant is not capable of the

kind of reflection that would enable him to fabricate information. *Apolinar v. State*, 155 S.W.3d 184, 186 (Tex. Crim. App. 2005). The critical determination is whether the declarant was still dominated by the emotions, excitement, fear, or pain of the event or condition at the time of the statement. *Zuliani*, 97 S.W.3d at 596. In other words, we must determine whether the statement was made "under such circumstances as would reasonably show that it resulted from impulse rather than reason and reflection." *Id.* Factors we may consider include the length of time between the occurrence and the statement, the nature of the declarant, whether the statement is made in response to a question, and whether the statement is self-serving. *Apolinar*, 155 S.W.3d at 187.

In analyzing these factors, we note that while there is no direct testimony as to how much time elapsed between the stabbing and Blue's statement to his mother, the evidence suggests that at least 15 to 20 minutes passed while Blue presumably walked back to his mother's house. While this time interval is not so great as to render the statement inadmissible per se, it is a sufficient amount of time in which Blue could have formulated a story about why he stabbed Martin. Although the statement was made in response to Dora's inquiry, and, according to her, Blue's demeanor was very excited and fearful, we find most telling that the statement appears to be self-serving. *See, e.g., Dyke v. State*, No. 06-11-00129-CR, 2012 WL 954625, at *4 (Tex. App.—Texarkana Mar. 21, 2012, pet. ref'd) (mem. op., not designated for publication) (statement that could be viewed as presenting an argument for self-defense was self-serving, and trial court was within its discretion to exclude statement); *see also Martinez v. State*, 178 S.W.3d 806, 814-15 (Tex. Crim. App. 2005) (evidence of excited emotional state, standing alone, is not enough to qualify statement as excited utterance). Considering the totality of the circumstances, the trial court could have concluded that a reasonable person in Blue's shoes would have either

retained or regained the capacity to make a testimonial statement at the time of the utterance. *See Wall*, 184 S.W.3d at 745. At the very least, the trial court's ruling excluding Blue's statement to his mother was within the zone of reasonable disagreement; therefore, the court did not abuse its discretion. *See Apolinar*, 155 S.W.3d at 187; *Zuliani*, 97 S.W.3d at 595. Having found no error, we need not address Blue's arguments with respect to harm. TEX. R. APP. P. 44.2(a), (b). Therefore, we overrule Blue's second and third issues.

We affirm the judgment of the trial court.

Phylis J. Speedlin, Justice

Do not publish